[Crim. No. 1116.   Fourth Dist.   Aug. 21, 1956.]

THE PEOPLE, Respondent, v. HAROLD E. MacKENZIE, Appellant.

Head, Jacobs, Corfman & Jacobs for Appellant.

Edmund G. Brown, Attorney General, Leo J. Vander Lans, Deputy Attorney General, William O. Mackey, District Attor-

ney (Riverside) and W. B. Gustaveson, Assistant District Attorney, for Respondent.

BURCH, J. pro tem.*—On January 25, 1955, the Riverside County grand jury filed an indictment against Harold E. MacKenzie and Edward J. Seeman. The indictment charged a conspiracy, a felony, of asking and receiving bribes by public officers (violation of sections 182 and 68 of the Penal Code of the State of California). The conspiracy alleged was on the theory that MacKenzie, in his official capacity as an executive officer and employee of the Board of Equalization of the State of California, did conspire with Seeman to ask for and receive bribes on behalf of MacKenzie in the matter of issuing liquor licenses in Riverside and San Bernardino Counties. Thirteen overt acts are set forth in the indictment.

Following trial and verdicts of guilty, both defendants made motions to arrest judgment and for new trials, which motions were denied. Seeman was granted probation. MacKenzie was sentenced to state prison for the term prescribed by law, sentences to run concurrently with any prior uncompleted sentences heretofore imposed.

MacKenzie was the supervising liquor control administrator under the Board of Equalization for the counties of Riverside, San Bernardino and Orange. We are concerned here with two types of liquor licenses issued by the board; the on-sale seasonal license, known as "PQ"; and the on-sale general license known as "P." Only the latter had a market value, which, it was testified, ran between $15,000 and $18,000 during the years 1952 and 1953. Such licenses were limited to one per 1,000 population. On this basis, population increases justified additional licenses. MacKenzie screened the applications in his territory for either type of license and then conferred with William G. Bonelli, a member of the Board of Equalization and supervisor in the state liquor district which included MacKenzie's three counties. The character of the applicants and the location of their establishments were relevant to the right to a license of either kind.

The overt acts laid in the indictment have to do with a license issued to Yoland D. Markson on February 26, 1953. Markson owned the Deepwell Guest Ranch in Palm Springs. In the fall of 1952, in Riverside County, Markson met Seeman, who offered to secure a liquor license for Markson for $8,000.

---

*Assigned by Chairman of Judicial Council.

Seeman called Santos De Jesus at Palm Springs in January, 1953, and following thereafter the two met. Seeman told Santos that he could secure a liquor license for the Deepwell Guest Ranch for $8,000. Later, Santos and Seeman communicated by 'phone, then met in Palm Springs, when Seeman told Santos to procure $8,000 and deliver it to Irwin Shuman at the Chi Chi Club in Palm Springs and also to advise Markson to file an application for a seasonal license with the Board of Equalization office in San Bernardino. The application was accepted for filing at that office February 2, 1953. The next day Santos and one John Ravese met and delivered to Shuman at the Chi Chi Club, Riverside County, $8,000 cash. On February 26th a seasonal liquor license was issued by the State Board of Equalization in Sacramento to Yoland D. Markson, doing business as the Deepwell Guest Ranch, Palm Springs, Riverside County.

In support of the charge, Markson testified that in 1952 he talked to his restaurant manager, Santos De Jesus, about getting either a ''P'' or ''PQ'' license; that he met Seeman in Palm Springs by Santo's appointment and asked Seeman for a license, to which Seeman replied ''It will cost you $8,000''; that on February 2, 1953, the witness filed an application at the Board of Equalization office in Riverside with a Mr. Polcene; that on February 3, he drew a check for $8,000, payable to Santos De Jesus, which the latter endorsed; that the witness later received a seasonal license.

Santos De Jesus testified he knew Seeman and talked with him in late 1952 or early 1953 about a license for the Deepwell Ranch; that Seeman said he was in a position to help; that Seeman later told him a liquor license could be had for $8,000; that Santos arranged a meeting between Seeman and Markson; that Seeman later called the witness by 'phone and then they met; that Seeman told the witness to hand $8,000 in cash to Mr. Shuman at the Chi Chi Club in Palm Springs and that Markson would be informed about filing an application; that the witness received a check from Markson which he cashed in the presence of Mr. Ravese for $8,000; that this money was put in an envelope and handed to Mr. Shuman; that the witness then told Markson to file an application. John J. Ravese, sworn as a witness, corroborated Santos De Jesus as to the cashing of the $8,000 check and delivering the money in an envelope to Shuman at the Chi Chi Club. Irwin S. Shuman, being sworn, testified to the receipt of the envelope from Santos and Ravese for delivery to Seeman; that Seeman

had told him to expect such an envelope; that Seeman picked it up at a later date. Elliott W. Polcene testified that he was liquor control officer in the Riverside office, under William F. Boland, who, in turn, was supervised by MacKenzie; that on February 2, 1953, he accepted Markson's application on the order of one or the other of his superiors.

Mickey Jones testified that on October 25, 1954, she was indicted in Orange County with MacKenzie and one George Avas on charges of conspiracy and grand theft; that on that night MacKenzie informed her that he had told the grand jury that he didn't know her very well; that he wanted an attorney different from hers; that if she had picked up any envelopes MacKenzie did not know what she did with them. She further testified that special agent Cooper of the attorney general's office furnished her with a wireless microphone; that she concealed it on her person and entered Seeman's home in San Bernardino on December 8, 1954, and conversed with him; that the conversation was recorded; that on January 7, 1955, the witness had a conversation with MacKenzie in a Cadillac coupé de Ville at a time when Mr. Cooper was hidden in the trunk thereof and a recording was made of that conversation; that on January 10 she met with MacKenzie and Seeman in MacKenzie's home in San Bernardino; that she wore a wireless microphone concealed on her person and that the conversation was recorded. On cross-examination, the witness testified that she had denied any connection with MacKenzie when before the grand jury in October, 1954. On redirect, she testified that she reappeared before the grand jury and told the truth.

Special agent Cooper testified that he recorded the conversation of December 8, January 7, and January 10 after furnishing Jones with the microphone and that he did so without the knowledge or permission of MacKenzie or Seeman.

The following excerpts are taken from statements made by MacKenzie in the conversation of January 7:

"Mickey, I don't know, you—you don't seem to—you've avoided me and all this and that. . . . I just wanted you to use a little discretion for a reason. . . . Well, what the hell about Eddie? . . . Well, they haven't got a Chinaman's chance to convict the guy if he knows what he is doing. . . . Well, what do you think that I . . . don't you think that I have been handling it pretty good? . . . But, Jesus, I had the God damndest time getting ahold of you. . . . I'll . . . well, I'll give it to you straight. Right from the shoulder. . . . They made a

deal if you would go state's . . . ur . . . witness that they will take care of the bar in Huemene. . . . That I do remember you telling Pause that . . . you had a deal to turn state's witness. . . . Here's the thing. They scared you to death. . . . Why, the Attorney General's office. Who the hell else? They told you they knew about the Palm Springs deal. . . . All right. Well, do you know something? I'll go to the bucket if I have to. . . . I don't know why you would get scared. . . . I don't know whether you have listened to Seeman. Well, I don't know whether he's scared or not. Of course, he's scared if someone goes boom. But then, poor Eddie is nervous and all this and that. No, here's the thing I'm getting at; had they had anything in Palm Springs. . . . Well, they don't have anybody yet. If they had of, they would have indicted now. The longer they go the worse chance they got. . . . Are you going to turn state's evidence or not? . . . I have always had implicit confidence in you and you know that.''

The prosecution produced much more evidence. No receipt was given for the payment of large sums of money, the payment of which was, in each case, followed by licenses issued. No licenses were issued until the applicant had filled out a form in the office of the Board of Equalization and the form was withheld until MacKenzie authorized it to be given out.

Paul Thetford, operating Ted's Café, Joshua Tree, San Bernardino County, wanted a general on-sale liquor license and in 1952 was refused an application on inquiry at the Board of Equalization office in San Bernardino. On a second visit, he met MacKenzie and asked him the chance of getting the license and ''he said there wasn't any.'' Reading that a license had been issued to the El Adobe at Twentynine Palms, he called MacKenzie in November. MacKenzie said ''Maybe you will get one.'' ''I said, 'I will give you $3,000 if you will get me a license' '' ''He said, 'Could you make it four?' and I says, 'I haven't got it. I'll have to get it.' '' ''He said, 'How long will it take you to get it?' and ''I says, 'Oh, I have got it.' '' ''He said, 'You will be notified by telephone or by some person.' '' ''I said, 'Okay,' '' and ''I said 'How do you want the money?' '' ''He said, 'Cashier's check.' '' On January 1, 1953, Thetford was called on the 'phone. On the following day, accompanied by his wife, he went to Seeman's office with a cashier's check on The Joshua Tree National Monument Bank for $4,000. Seeman asked Mrs. Thetford to leave and then refused the check. Thetford cashed the check at the bank and gave the money to Seeman, who

put Thetford's initials on the envelope and told Thetford to go to the Board of Equalization office in San Bernardino and sign up for the license. Thetford followed Seeman's directions. In a month he received a seasonal license.

Defendant objects to the use in evidence of the Thetford transaction because it was not related to any of the overt acts charged in the indictment. Such evidence, though it shows a criminal disposition, has probative value (*People* v. *Tarantino,* 45 Cal.2d 590, 598 [290 P.2d 505] ; *People* v. *Costa,* 40 Cal.2d 160, 167 [252 P.2d 1]) and may be admitted . . . to prove a material fact or where (it) . . . tends to show motive, scheme, plan or system. (*People* v. *Henderson,* 79 Cal.App. 2d 94, 119 [179 P.2d 406] ; 11 Cal.Jur.2d 248, Conspiracy, § 29.)

Defendant argues that the evidence is insufficient to warrant the verdict. The excerpts we have set out above evidence much more than mere association or suspicion of a conspiracy, but show interest and activity in the success of the enterprise and aid and assistance on the part of MacKenzie. Those who pay a bribe are not accomplices of those who conspire to ask and receive the bribe. (*People* v. *Lyon,* 135 Cal.App.2d 558, 576 [288 P.2d 57].) The case of *People* v. *Davis,* 210 Cal. 540 [293 P. 32], is not to the contrary but points to the need of corroboration of an accomplice. We agree with the statement of counsel that the corroborative evidence should be considered apart from the evidence of Seeman, the coconspirator of MacKenzie, and clearly his accomplice. When thus considered, the corroboration shows MacKenzie asking for a bribe ; the payment of the $4,000 he required ; and thereafter the delivery of an application—a matter in MacKenzie's control—all followed by receipt of the coveted license. The Markson transaction shows Seeman operating, directing and effecting the same lawless course which was evidenced against MacKenzie in the Thetford case. Seeman's control over the action of the office of the Board of Equalization in San Bernardino in releasing to Markson an application was without warrant of any authority except that of MacKenzie. The jury was justified in finding MacKenzie withheld the application until Seeman reported the payment of the $8,000 bribe. (*People* v. *Bennett,* 132 Cal.App.2d 569, 576 [282 P.2d 590].)

Defendant makes the further suggestion that the use in evidence of the recordings of conversations had between Mickey Jones and MacKenzie in her wired automobile on

January 7, 1955, and in MacKenzie's home on January 10, violated the search and seizure provisions of the state Constitution (art. I, § 19) and the Fourth Amendment of the Constitution of the United States. The question of the admissibility of these same recordings was passed upon by this court in *People* v. *Avas* [*MacKenzie*], *ante*, p. 91 [300 P.2d 695]. It was there held that the evidence was obtained by the special agents of the attorney general's office, assisted by Mickey Jones, without trespass or violence upon their part, but with the lawful aid of mechanical improvements to overhear those conversations. We concluded that these recordings were admissible in that case which charged MacKenzie with conspiring to ask and receive bribes. No different or additional showing of the manner of procuring the evidence is made here. We hold these recordings are admissible and not in violation of MacKenzie's constitutional right to a fair trial. (See *On Lee* v. *United States*, 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270].)

Defendant also objects to remarks extracted from the argument to the jury by the district attorney. The excerpts which defendant assigns as prejudicial misconduct are stated thus:

". . . All the lawyers in the world wont change the facts in the case. They may distort the facts, they may twist them around, they may color them, but they'll never change the facts."

"So I tell you right now you can come to the conclusion as I have . . . They (defense lawyers) were waiting to see how this (Seeman's) testimony developed in this case to see who they could *pin* it on." (Italics ours.)

"(t)he defense in this case smells like the fish."

"Now if they say that Mickey works in a fish plant she smells, she is no good, then I say they smell and they are no good because everybody that works in a fish cannery smells just exactly the same."

"Here is a man she had done dirty work for over years and now she is in a jam and he give her the old fashioned brush off."

"No to acquit these men means you not only condone what they did, but you are giving them a pat on the back, and you are telling other public officials that, in Riverside county, juries con't convict public servants for graft and corruption."

These remarks, even considered as isolated statements, are no more than a statement of his conclusions from the evidence.

Moreover, no objection was made to the trial court as to these remarks at the time they were spoken in the heat of the trial. Had the trial judge been given the opportunity to pass upon any possible prejudicial effect or to correct the impression on the jury of any excesses then and there observed and felt, defendant's contentions here would carry more weight. Where objection is not made to the trial court, the general rule is that the remarks will not be deemed on appeal to be prejudicial, unless, from a study of the entire record, the appellate court is so convinced. "Each case must be judged by its own particular circumstances and much must be left to the discretion of the trial court in determining whether an attorney overstepped the bounds of legal propriety in the conduct of the trial." (*People* v. *Hanks,* 35 Cal.App.2d 290, 303 [95 P.2d 471].) It was said in *People* v. *Head,* 108 Cal.App.2d 734, 737, 738 [239 P.2d 506], that "A prosecutor has a right to state his views and his beliefs and convictions as to what the evidence establishes and to urge that the evidence convinces his mind or is conclusive of the guilt of the defendant. (*People* v. *Acuff,* 94 Cal.App.2d 551, 558 [211 P.2d 17].)" No more than this here appears. A study of the record in this case convinces us that the defendant has received a fair trial and that the general rule requiring the objection to be made to the trial court is applicable here.

Finally, defendant suggests error in the court's refusal to give two instructions:

"You are instructed that under the evidence in this case Mickey Jones had been an accomplice and codefendant of the defendant MacKenzie in a crime charged in an indictment in Orange county, and therefore her testimony must be viewed with distrust."

And the other:

"You are instructed that under the evidence in this case Mickey Jones had been an accomplice and codefendant of the defendant McKenzie in a crime charged in an indictment in Orange county, and therefore as a matter of law the witness Mickey Jones was an accomplice."

In the present action, Mickey Jones is not named as codefendant or charged as a conspirator, but the jury was given full information about her activities with MacKenzie and Seeman and the immunity granted her in the Orange County case where she was a defendant and an accomplice. The question of her credibility was argued extensively. The court fully and properly instructed the jury as to the credibility of

witnesses, and as to who was and who was not an accomplice, and the necessity for corroboration and the extent thereof. If Mickey Jones was an accomplice in some of the transactions referred to in the evidence, which we do not decide as a matter of law, the failure to instruct the jury to that effect would not be prejudicial error. (*People* v. *Knoth*, 111 Cal.App. 250 [295 P. 577] ; *People* v. *Ferlin*, 203 Cal. 587 [265 P. 230] ; *People* v. *Chapman*, 93 Cal.App.2d 365, 383 [209 P.2d 121].)

The judgment and orders appealed from are affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied September 4, 1956, and appellant's petition for a hearing by the Supreme Court was denied September 18, 1956.