[Crim. No. 3559. First Dist., Div. One. Mar. 26, 1959.]

THE PEOPLE, Respondent, v. ALBERT WOJAHN, Appellant.

Rosendale, Thomas & Muller for Appellant.

Edmund G. Brown and Stanley Mosk, Attorneys General, Clarence A. Linn, Chief Assistant Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

BRAY, J.—Defendant appeals from a judgment on a jury verdict finding him guilty of the crime of rape by use of drugs in violation of section 261, Penal Code, and from the order denying new trial.

### QUESTIONS PRESENTED

1. Sufficiency of evidence.
2. Alleged error in permitting prosecutrix to refresh her memory.

3. Was the recorded conversation between defendant and the prosecutrix obtained illegally?

4. Was the recording inadmissible (a) because defective; (b) because of the best evidence rule?

5. Was it error to distribute transcripts to the jury?

6. Testimony of similar attempt with another woman.

7. Instruction concerning that testimony.

8. Alleged misconduct of district attorney.

1. EVIDENCE.

Bonnie, aged 21, a married housewife and mother, being bothered by chest pains and fearing tuberculosis, went to defendant, a physician and surgeon, for an X-ray. She had visited him twice before, once for a tetanus shot for herself and once for treatment of her son. Defendant was alone in his office. After explaining her symptoms to him, defendant had her disrobe and put on an examination robe. Bonnie testified that he gave her a shot which he said was to cut the mucous in her throat and a capsule to quiet her nerves. Thereafter she was unable in standing against a wall with her eyes closed to touch her nose with her fingers. She felt light and relaxed, her feet felt glued to the floor, and she felt as though her body were swaying. She detailed his actions, which culminated in one or more acts of sexual intercourse with her. She became frightened and dizzy and almost blacked out. He told her he "did that" to bring up her blood pressure. As she was leaving he made an appointment for the following Monday, and attempted to kiss her, saying, "What is the matter, honey? Didn't you like that?" Bonnie denied consenting to defendant's actions. Leaving his office Bonnie unsuccessfully attempted to find her husband, and then went to her neighbor, Mrs. Trail, who testified she complained of being raped by defendant, was nervous, upset, her eyes were red, her lipstick smeared and her hair mussed. Her legs were shaking. Mrs. Trail accompanied Bonnie to the police station where she related what had happened. The police captain testified that Bonnie's hair was disheveled, she was red eyed, crying, hysterical, and appeared to be drugged. Later she was taken to the County Hospital where she was examined by a doctor. She seemed nervous and excited, a condition consistent with the possibility of a sexual assault. The doctor saw no bruises, tears or evidence that any brute force was exerted on the external genitalia or thighs, nor was any spermatozoa revealed as a result of a vaginal smear.

Pursuant to arrangements with the police, Bonnie returned to defendant's office. Defendant had invited her to return on Monday. She telephoned defendant cancelling that appointment and asking for another date. She carried a concealed minaphone which recorded her conversation with defendant. The police instructed her what to say. The wire recording of this conversation concerned itself with the events of Bonnie's prior visit to defendant and contained admissions by him of his relations with her.

A medical doctor testified that, in his opinion, a woman with symptoms similar to Bonnie's on the date of the alleged offense would be under the influence of drugs.

To show plan, design or scheme of defendant, a Mrs. Donati detailed an attempted rape of her by defendant under similar circumstances about a year earlier.

Defendant denied in substance most of plaintiff's testimony, stating that his conduct toward Bonnie was of a professional nature and the extent of the examination was guided by his professional opinion. While examining her neck Bonnie kissed him. He said he gave her a shot of penicillin and a capsule containing a tranquilizing drug called compazine, to calm her prior to examination. He took the capsule from a package of 12, giving her the other 11 to take home. (Bonnie stated that he gave her two packages of six capsules each to take home to calm her nerves. The capsules were similar to the one she took at his office.) As to the recorded conversation defendant stated that he agreed and went along with her leading questions concerning the events of her prior visit because (1) she was talking so loudly, and (2) "there was no point in trying to argue with her" because she was apparently undergoing an emotional disturbance.

A medical doctor called by defendant testified that in his opinion the administration of the tranquilizer in combination with a narcotic drug could not have created the condition described by Bonnie, namely, that her will, but not intellect and capacity to remember, was affected.

Defendant concedes that Bonnie's testimony that she felt defendant have intercourse with her may be sufficient evidence to prove the element of intercourse, although he contends that it is somewhat improbable because she never observed his penis nor saw his clothes disarranged. In view of her testimony that she was lying down at the end of the examining table with her feet in stirrups, a position in which she could not see below defendant's waist, that defendant had her close

her eyes and that when she opened them he would sit down on a stool at the side of the table, and the other circumstances, her story is not inherently improbable.

Defendant's main attack is on the sufficiency of evidence of drugging. ■ Rape by drugs may be proved by circumstances and surroundings. See *People* v. *Crosby* (1911), 17 Cal.App. 518 [120 P. 441], where the drug administered made the prosecutrix "weak and dizzy." ■ Here there was sufficient evidence on this subject. (1) Admittedly defendant administered a shot and a capsule. He testified to a familiarity with and administration of anesthetics, involving combinations of drugs. (2) Bonnie felt "groggy." She felt calm, very relaxed, and her body seemed swaying while her feet would not move. The police captain testified that she appeared to be drugged. (3) The People's expert testified that her symptoms as related would indicate that she was under the influence of drugs. True, defendant's expert testified to the contrary but that was a matter to be, and it was, resolved by the jury. The fact that Bonnie was not given any tests for drugs on the day of the attack, while regrettable, is not fatal to the prosecution's case. Generally, from the very nature of the offense there can be no direct evidence of the administration of a drug. While the prosecution's case here may not be altogether satisfactory, it does support the theory of the prosecution and its weight was a matter for the jury and is sufficient to sustain the verdict. (See *People* v. *Crosby, supra,* 17 Cal.App. at p. 524.)

2. REFRESHING MEMORY.

■ Plaintiff asked Bonnie if she recalled the conversation with defendant on her return to his office. She replied, "No, not completely." The court asked if she had a sufficient present recollection. She replied "No." Over objection she was permitted to read notes made by a police secretary at Bonnie's direction after listening to repeated playings of a tape recording made from the original wire recording of the conversation. Bonnie testified that when the notes were made she had an independent recollection of the conversation, and that the notes were a correct version of the conversation. The notes were not offered in evidence. (They would have been inadmissible. *Hawkins* v. *Sanguinetti* (1950), 98 Cal.App. 2d 278, 284 [220 P.2d 58].) Section 2047, Code of Civil Procedure, provides: "A witness is allowed to refresh his memory respecting a fact, by anything written . . . under his

direction, at the time when the fact occurred, or immediately thereafter, or at any other time when the fact was fresh in his memory, and he knew that the same was correctly stated in the writing. . . .'' All of the requirements of this section were met and the witness was entitled to refresh her memory, even though, as contended by defendant, it was not clearly shown that Bonnie did not have a present recollection. Although Bonnie was specific about the events of her first visit to defendant, and it would seem that she might have had a similar recollection about a conversation a few days later, it is not always as easy to remember accurately a conversation as it is to remember a series of events. Here it was important for the prosecution to bring out the entire conversation in order to show defendant's incriminating statements.

3. RECORDED CONVERSATION.

 Defendant contends that the wire recording obtained by the use of the microphone carried by Bonnie was illegally obtained and hence under the ruling in *People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905], inadmissible. However, defendant has cited no pertinent authority to support his contention. The authorities cited by him such as *People* v. *Tarantino*, 45 Cal.2d 590 [290 P.2d 505], and *Irvine* v. *California*, 347 U.S. 128 [74 S.Ct. 381, 98 L.Ed. 561], dealt with entirely different situations than the situation here. In those cases entry was made into a defendant's premises without his permission, constituting a trespass, and microphones installed and conversations which the defendant had no way of knowing could be repeated on the outside were recorded. Here, Bonnie was invited to return to defendant's office, and defendant knew that whatever he said to Bonnie could be repeated by her to others. Actually, the method used made the retelling of the conversation more accurate than its retelling by Bonnie could possibly be. The situation was no different than if Bonnie had her hands concealed in a muff and thereby was enabled to take down defendant's statements. In *On Lee* v. *United States* (1952), 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270], the majority court (5 to 4) refused to hold illegal, evidence obtained when a ''stool pigeon,'' an old acquaintance and former employee of the defendant entered the latter's place of business along with customers and engaged the defendant in conversation, which conversation was relayed to a receiving set in the hands of the police outside the building by means of a transmitter concealed on the ''pigeon's'' person. The court held that there was no trespass, saying that the defendant's con-

tention (the same contention is made here) that the defendant's consent to the entry was obtained by fraud, because the real purpose of the visit, namely, to get evidence against the defendant, was concealed, requires rejection of "such fine-spun doctrines for exclusion of evidence." (P. 752.) It is true that four of the justices dissented. However, it must be remembered that the case did not deal with a situation comparable to ours. There the defendant was talking to a former employee with whom he had the right to assume he was talking in confidence. The dissenters placed their opinions on the claim that it was "dirty business" to allow such type of conversation to be carried to third persons listening on the outside. As pointed out above, the conversation between defendant and Bonnie was such that defendant reasonably must have known that it would be communicated to others. They were dealing with each other at arm's length. There was no "dirty business" connected with Bonnie making an accurate record of what defendant said to her.

Section 653h, Penal Code, provides: "Any person who, without consent of the owner, lessee, or occupant, installs or attempts to install or use a dictograph in any . . . office . . ." is guilty of a misdemeanor. It is doubtful if the microphone used here is a "dictograph." Assuming that it is, the section could not have been intended to cover a recording device of the type and use made of it under the circumstances of this case.

The California courts have ruled that evidence obtained by somewhat similar recording devices under similar circumstances to those here is not illegal and is admissible. In *People* v. *Avas,* 144 Cal.App.2d 91 [300 P.2d 695], a person whom defendant characterizes as a "planted stool pigeon" had a microphone concealed on her person when she met the defendant in her car and in his home, to which she had been invited. Her conversation with him was transmitted to special agents at an outside "listening post" and the conversation was there recorded. The court held that one invited to enter is not a trespasser. In *People* v. *MacKenzie,* 144 Cal.App.2d 100 [300 P.2d 700], an invitee of the defendant equipped with a microphone concealed on her person, entered his parlor and her conversation with him was transmitted to a recording set in a nearby police car. In *People* v. *Goldberg,* 152 Cal.App.2d 562 [314 P.2d 151], an invitee of the defendant who had a concealed microphone on his person sat with the defendant in the latter's automobile. Their conversation was recorded outside

the car. The court said that the person equipped with the microphone "did not become a trespasser merely because he was ready and eager to hear and record what the enemies of the State might say." (P. 573.) Further, "The recorded conversation which occurred in the automobile was the result of a prearranged meeting. In no sense was it inadmissible as the product of an unreasonable seizure." (P. 573.) Hearings by the Supreme Court were denied in all three cases.

In *People* v. *Tarantino, supra,* 45 Cal.2d 590, the court in holding that section 653h which excludes from its provisions the use of dictographs by a peace officer under the conditions there set forth, did not permit such use if it was in violation of constitutional guarantees. It then stated that the secret entry of the defendant's room and the hiding of the microphone therein did violate such guarantees because such act was an unreasonable violation of the defendant's right of privacy, as well as a trespass. In our case, Bonnie was not trespassing nor in view of the fact that the defendant knew that any statements made by him to her would be mentally carried by her from the room and probably repeated to others, was there any violation of defendant's privacy. *People* v. *Avas, supra,* 144 Cal.App.2d 91, 99, distinguished the Tarantino case in that in that case "there was criminal conduct in the way of unlawful entry, a breaking and entering without the will of the defendant" (p. 99), while in the Avas case "the element of unlawful entry is absent. One invited to enter is not a trespasser. His entry does not become a trespass because he may be alerted to learn facts or to hear damaging declarations either by his natural faculties of hearing and sight or with mechanical and electronic aids of science. *On Lee* v. *United States,* 343 U.S. 747 [72 S.Ct. 967, 96 L.Ed. 1270] draws this distinction after an extensive review of the search and seizure cases of the United States courts." (P. 99.) In the Avas case and in *People* v. *MacKenzie, supra,* 144 Cal.App.2d 100, the microphone was hidden on the person of one Mickey Jones under arrangement with special agents of the attorney general's office. In *People* v. *Goldberg, supra,* 152 Cal.App.2d 562, the microphone was installed on the defendant's invitee by a police officer. While section 653h is not discussed in any of the three last mentioned cases, it is obvious that the court in each case could have considered that the provision in section 653h excluding from the operation of the section the use of a "dictograph" by a "salaried peace officer," etc., was met when such peace officer arranged for the installation of such instrument

on the person of another to be used under instruction of the officer. For this reason we deem it unnecessary to determine whether a "microphone" is a "dictograph" as mentioned in the section.*

4. ADMISSIBILITY OF RECORDING.

(a) *Was it defective?*

█ The recording was played to the jury and a transcript of it made by the police secretary and testified by Bonnie as being correct was admitted in evidence and copies given to the jury. Defendant contends that in the transcript there are 78 instances where the secretary inserted dots to indicate that she did not understand what was said and that at these places the recording was either inaudible or unintelligible. Nevertheless the court determined that the recording presents a lucid reproduction of the conversation and that the portions not clearly understandable in nowise affected the general tenor of the conversation. Defendant has not pointed out a single instance of anything favorable to him which was not clearly audible or which was omitted from the transcripts.

In *People* v. *Stephens*, 117 Cal.App.2d 653, 660 [256 P.2d 1033], a forgery conviction was reversed on the ground that, as a matter of law, the evidence was insufficient. Recordings of conversations between the defendant and others were played for the jury. The reviewing court noted that the record revealed that the conversations were unintelligible and inaudible in many parts. Witnesses who heard the conversations were available. However, the unintelligible recordings were nonetheless used and apparently were susceptible to various interpretations. Here, the nature of the unintelligibility is not explained by defendant. However, it does not appear that the recording was subject to various interpretations as in the Stephens case, *supra*. The admission of the recordings was not prejudicial to defendant.

---

*Webster's International Dictionary, 2d ed., defines "Dictograph": "A trade-mark for a telephonic instrument having a sound-magnifying device that makes possible the transmission of sounds from a room in which the transmitter is stationed or concealed; hence . . . the instrument bearing this trade-mark. The ordinary mouthpiece is not required. The Dictograph is used as an interoffice telephone, esp. for dictating to a stenographer in another room, and is also employed to obtain evidence for court use." 26A C.J.S. 935, defines "Dictagraph": "A telephone capable of reproducing sounds made at considerable distance from the transmitter and audible at corresponding distance from the receiver; and so not necessarily a recording machine like a phonograph, but a concealed telephone transmitter which reproduces the sound in the next room by a receiver."

If there were matters in the recordings foreign to the case, we find no suggestion or request by defendant that they be deleted.

(b) *Best evidence rule.*

■ Admission of the tape re-recording was objected to under that rule. In *People* v. *Stephens, supra,* 117 Cal.App. 2d at page 660, the court said: "It would appear to be the law that such recordings are admissible in evidence and that the best evidence rule is not applicable; that the recordings are more reliable and satisfactory evidence than testimony of conversations given from memory by those who overheard them." The "such recordings" referred to were re-recordings made from original tape and wire recordings.

A re-recording is apparently clearer. The original was played to demonstrate the accuracy of the reproduction. Therefore, both were before the jury and, considering the language of the Stephens case, *supra,* the best evidence rule appears inapplicable.

5. TRANSCRIPTS GIVEN JURY.

■ The accuracy of the transcripts was established and no objection was made as to their possible inaccuracy. The transcript was given to the jury only during the playing of the two recordings. They would appear to have been an aid to the jury in following the recordings. Defendant fails to point out how he was prejudiced by this procedure. In *United States* v. *Schanerman,* 150 F.2d 941, cited by defendant, recorded conversations were played before the jury. As to the instant issue, the court merely said, "Transcribed notes, made by a stenotype operator from hearing the records repeatedly 'played,' were properly excluded . . ." (P. 944.) No reasons were given nor any authority cited. Whether or not such transcripts may be used is a matter in the discretion of the court. At most, the statement in the Schanerman case means that a refusal to permit their use would not constitute an abuse of discretion. Under the circumstances here we see no prejudice to the defendant nor any abuse of discretion by the trial court, in the limited use of the transcript while the recordings were being played.

6. SIMILAR ATTEMPT.

■ Defendant contends that the testimony of Mrs. Donati was inadmissible, citing at great length writers and decisions considering the rule that evidence of other offenses is ordinarily inadmissible and the exceptions to this rule. (*People* v.

*Albertson* (1944), 23 Cal.2d 550, 576-578 [145 P.2d 7]; *People* v. *Peete* (1946), 28 Cal.2d 306, 314-315 [169 P.2d 924]; and 2 Wigmore on Evidence, 3d ed., §§ 304, 357.) It serves no purpose to review these authorities, since defendant's argument is not with the law, but rather its application. Suffice to say, in *People* v. *Cassandras* (1948), 83 Cal.App.2d 272 [188 P.2d 546], evidence of a prior rape or attempt, committed under circumstances remarkably similar to the one charged, was admissible to show a plan or scheme to commit the crime in that fashion, even though the prior rape or attempt was committed on a person other than the prosecutrix. (See also *People* v. *Albertson, supra,* 23 Cal.2d 550; *People* v. *Dabb,* 32 Cal.2d 491, 500 [197 P.2d 1]; *People* v. *Sykes,* 44 Cal.2d 166, 170 [280 P.2d 769].)

In the Cassandras case, *supra,* the defendant was accused of approaching a needy woman near an employment agency, luring her to a room with the promise of a job, and forcing her to submit under a threat of having her arrested and her children taken from her. The prosecution offered an "other offense" witness who testified that defendant had approached her near an employment agency and similarly lured her to a room and forced her to submit under similar threats.

In the present case, the circumstances of the alleged rape were unusual, to say the least. Therefore, if a similar offense were shown, it would obviously corroborate Bonnie's testimony and be of great probative value in proving that Dr. Wojahn probably committed the offense charged in the manner described by Bonnie. Mrs. Donati's testimony bears a striking similarity to the present charge. About a year previously, she visited Dr. Wojahn with a complaint about a hip dislocation. She was told to put on a robe, received an unsolicited pelvic examination from defendant who did not use gloves. Defendant unprofessionally fondled her breasts and pulled her nude body against his. He additionally wanted to give her something to relax her, but she insisted on leaving. (Defendant admitted giving her a pelvic examination, but denied any improper conduct.)

Defendant contends that this testimony reveals neither a prior rape or attempted rape and that it does not constitute evidence that defendant intended to rape Bonnie a year later. The prosecution need not prove all elements of a prior offense beyond a reasonable doubt, since the defendant is not on trial for that offense. (*People* v. *Albertson, supra,* 23 Cal. 2d 550, 579.) It is clear defendant did not rape Mrs. Donati.

148

However, there is more than a mere suspicion that an attempted rape or criminal assault was committed. The important consideration is not establishing beyond doubt a prior offense, but in showing the similarity of prior acts as tending to show that defendant committed the present charge in the manner described by the prosecutrix. (*People* v. *Cassandras, supra,* 83 Cal.App.2d at p. 282.) Similarly, the "prior offense" testimony is not offered to show a plan or intent to commit rape a year later as defendant suggests. It is the "fashion" of committing the offense that constitutes the design, not a plan formed a year earlier to commit rape. Defendant concedes that the year interval does not render Mrs. Donati's testimony too remote.

As recognized in many cases (see *People* v. *Albertson, supra,* 23 Cal.2d at p. 577) this "other offense" evidence must be cautiously received because of its great prejudicial nature. However, this danger must be weighed against the probative value of the evidence. Mrs. Donati's testimony revealed a sufficiently high degree of common features with the alleged rape of Bonnie to warrant the inference that if Dr. Wojahn committed those acts towards Mrs. Donati, he probably committed the offense charged by Bonnie. (*People* v. *Cassandras, supra,* 83 Cal.App.2d at pp. 279-280.)

7. INSTRUCTION.

The court gave an instruction concerning Mrs. Donati's testimony based somewhat on CALJIC Number 33. Defendant does not complain of it as far as it went but contends that it should have been qualified. The instruction given is actually milder than a similar one offered by defendant, which also contained no qualification. Therefore, defendant cannot now complain that the instruction given was not sufficient. (See *People* v. *Bradbury,* 155 Cal. 808 [103 P. 215].)

8. ALLEGED MISCONDUCT.

In discussing the admissibility of the testimony of Mrs. Donati, and replying to the statement of defendant's attorney that the fact that the incident concerning which she was testifying occurred a year prior negatived any plan or scheme on defendant's part, the district attorney said, "I might also indicate to the Court that the mere fact that other offenses might not be shown in between does not——" The court interrupted, saying, "We have no proof of any other offense." The court then denied defendant's motion for

mistrial but did instruct the jury to disregard the statement. We see no misconduct by the district attorney nor error in the court's action. If the statement is at all intelligible it was favorable to the defendant, showing that he had committed no other offenses between the Donati one and the one charged.

The captain of the Salinas Police Department was testifying to Bonnie's condition the afternoon of the day she was assaulted by defendant. He said, "She was so hysterical she couldn't give me a good story on the thing except that she had been drugged . . ." Later the district attorney asked, "Now, the Judge mentioned a conclusion. Was it your conclusion that she was drugged or was that what she said?" The court interrupted, saying ". . . what she said is obviously hearsay and the jury is admonished to disregard such statements." The district attorney then called attention to the fact that the witness had already mentioned that she said it. The court then ordered the statement out of the record and admonished the jury to disregard it, saying that what she told him was "hearsay and doesn't follow any of the rules." The district attorney then asked, "Did she say it or not?" The court then reprimanded him. While the district attorney should not have again asked the question in view of the court's ruling, it appears to be merely one of those things which occur in the heat of a hardly fought legal battle and did not constitute wilful misconduct.

Nor did the following: In his closing argument the prosecutor, in discussing the crime of rape, stated that when a person acts out of passion he does things which do not make sense to "the rest of us. For example, if a person has some physical or mental aberration that causes him to expose himself to small children, why, this——" Defendant cited this as misconduct. The court then stated: "That's a very dangerous example in a case like this," and admonished the jury to disregard it. In each of the above instances the admonition of the court was sufficient to obviate any prejudicial effect.

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 20, 1959. Peters, J., did not participate therein.