Filed 9/4/13  P. v. Windsor CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C068690 |
| v. | (Super. Ct. No. 09F01376) |
| ROCKY WINDSOR, | |
| Defendant and Appellant. | |

Defendant Rocky Windsor was convicted by jury of eight counts of committing a forcible lewd or lascivious act on a minor under the age of 14 years.  With respect to each count, the jury also found defendant engaged in substantial sexual conduct with the victim.  The trial court sentenced defendant to serve an aggregate determinate term of 64 years in state prison and imposed other orders.

On appeal, defendant contends his trial counsel rendered constitutionally deficient assistance by failing to properly admit into evidence several out-of-court statements made by the victim that were purportedly inconsistent with her testimony at trial.  Assuming, without deciding, counsel's performance fell below an objective standard of reasonableness, we conclude there is no reasonable probability the result of the

1

proceeding would have been different had these statements been admitted into evidence. Accordingly, we affirm the judgment.

FACTS

J.R., the victim in this case, was born to her teenaged mother and father in September 1995. The parents' relationship ended shortly before her birth. Initially, J.R. lived with her mother and grandmother. In July 1997, mother gave birth to a second daughter, A.M.

Defendant and mother began a relationship sometime in 1999. In March 2001, mother gave birth to a third daughter, M.W. Mother's fourth daughter, Z.W., was born in June 2002. Defendant fathered these children.

In 2003, defendant and mother, as well as A.M., M.W., and Z.W., moved into an apartment in Rancho Cordova. Shortly before the move, J.R. moved in with her father, but stayed with her mother on certain weekends. In June 2003, mother gave birth to a son, G.W., who was also fathered by defendant.

### *Incidents at the Rancho Cordova Apartment* (*Counts 1 & 2*)

Defendant's abuse of J.R. began at the Rancho Cordova apartment. She was seven years old and in the first grade. The first incident she remembered occurred in her mother's bedroom. Defendant removed J.R.'s clothes and rubbed his penis against her vaginal area as they lay on the floor. J.R. asked him to stop and tried to push him off of her, to no avail. Eventually, defendant ejaculated on either her stomach or back and told her to take a shower. Mother was not home at the time. The second incident was nearly identical to the first, except that it occurred in another room while mother was in her bedroom. J.R. again told defendant to stop and unsuccessfully tried to push him off of her. Defendant again ejaculated on either her stomach or back and immediately told her to take a shower. In all, defendant rubbed his penis on J.R.'s vaginal area on "[m]ore than five" separate occasions at the Rancho Cordova apartment. Defendant threatened to

2

burn her if she told anyone what he was doing to her. He also threatened to hurt her mother and siblings.

### *Incidents at the Folsom Apartment* (*Counts 3 through 6*)

Defendant and mother broke off their relationship in November 2003, prompting defendant to move out of the Rancho Cordova apartment. A short time later, mother moved A.M., M.W., Z.W., and G.W. into an apartment in Folsom. J.R. asked her father if she could also move in with mother. He agreed as long as she kept her grades up, which she did during the second grade.

Toward the end of 2004, defendant and mother resumed their relationship. Defendant moved into the Folsom apartment and resumed his abuse of J.R., who was now in the third grade. Defendant rubbed his penis on her vaginal area on "[m]ore than five" separate occasions at this apartment as well. At some point, J.R. ceased telling defendant to stop. As she explained: "I realized it wasn't doing any good, so I just let it happen." On one occasion, in the living room, after defendant rubbed his penis against J.R.'s vaginal area while bending her over the armrest of the couch, he "tried to penetrate [her] anally." When she cried out in pain, defendant stopped and said: "[T]hat's okay. I'll be in there some day." A few weeks later, defendant again bent J.R. over the armrest of the couch. This time, using lotion as a lubricant, he penetrated her anus with his penis. J.R. tried to get away, but defendant held onto her back with his hands and used his body weight to press her into the couch. After moving his body "back and forth," defendant withdrew his penis and ejaculated on the floor.

Defendant lived in the Folsom apartment for about two months, at which point he and mother again broke off their relationship. Defendant moved out in December 2004. J.R.'s grades declined dramatically during the third grade, prompting her father to insist that she move back in with him for the start of the fourth grade. Mother agreed. After moving in with her father, J.R. stayed with her mother about two weekends a month.

3

***Incidents at the Citrus Heights Apartments* (*Counts 7 & 8*)**

In March 2006, defendant moved into an apartment in Citrus Heights. Mother moved A.M., M.W., Z.W., and G.W. into an apartment "about 150 yards down the road" from defendant's apartment in July 2006. J.R.'s visitation schedule remained unchanged. While mother and defendant did not resume a dating relationship, defendant would periodically watch mother's children, including J.R., at both his apartment and mother's apartment. During these visits, defendant resumed his abuse of J.R., rubbing his penis on her vaginal area "[a]bout five times." On one occasion, defendant penetrated her vagina with his penis. J.R. also testified defendant licked her vaginal area "almost every time" he molested her, but did not remember at which apartment the oral copulation began. The abuse ended when defendant moved to Rocklin in October 2006.

**J.R.'s Statements Regarding the Abuse**

J.R. reported defendant's conduct to her father when she was 13 years old, about two years after the abuse stopped. She did not report the abuse earlier because she was "scared" and "didn't know what would happen" if she told anyone. However, after learning about human reproduction in her seventh grade science class, she decided she "didn't want to hold it in anymore." Her initial account of the abuse omitted many of the details she later revealed to the District Attorney's investigator and testified to at trial. For instance, she did not tell her father about the oral copulation. Nor did she reveal that defendant's penis penetrated her vagina and anus. J.R. omitted these details because she was "embarrassed" and thought her father would think less of her if he knew the extent of the abuse. She also "wasn't sure" whether her father would be angry with her for allowing it to happen.

J.R.'s father immediately reported the abuse to law enforcement. That day, an officer interviewed J.R., who provided a similarly minimized account of the abuse. As she explained, she was "embarrassed" and "afraid of what [her] dad might think of [her]." At some point, J.R. was interviewed by a counselor at the Multi-Disciplinary Interview

4

Center (MDIC), also known as the Special Assault Forensic Evaluation (SAFE) Center. Again, J.R. was not "entirely truthful" about the extent of the abuse she suffered at the hands of defendant. She was "embarrassed" because she knew a detective was watching the interview from behind a one-way mirror. She was also afraid she would get in trouble if she told the interviewer something different than she had told her father and the officer who conducted the first interview.

Over time, J.R. became more comfortable talking to her father about the abuse and revealed that defendant's conduct included penetration. J.R.'s father again contacted law enforcement and brought J.R. to the District Attorney's office for an interview. During this interview, J.R. stated that "she had not disclosed everything that had happened to her in the SAFE interview or to prior detectives." She revealed that defendant "us[ed] his tongue" and "put his fingers inside of her vagina," and "this occurred every time that these incidents occurred." J.R. stated defendant had "put his penis inside of her vagina" and he did the same to her "back side." She "clarified that while living in Rancho Cordova [defendant] attempted to insert his penis into her anus, but stopped when she said it hurt," and he then stated: "[T]hat's okay. I'll be in there some day." Defendant successfully penetrated her anus "a few weeks later," as previously described. J.R. also revealed the incident in which defendant "insert[ed] his penis into her vagina while she was at an apartment in Citrus Heights."

J.R. stated that "most of the incidents would occur when her mother worked at night" and "remembered being about eight or nine years old while living at the Rancho Cordova address." She further revealed defendant "would masturbate himself" after rubbing his penis on her vagina "and then ejaculate on her back or stomach on almost every incident." J.R. explained that "the first year or two she would ask [defendant] to stop, but that she stopped making such a request because she knew it would not do any good." When asked why she did not disclose these details during the SAFE interview, J.R. responded that "she was going to tell everything at the SAFE interview, but became

5

nervous when she was told that the detective was watching, that there was a microphone, and she could hear the camera zooming in and out. [J.R.] said all of these things made her extremely nervous and she did not want people to think she was weird."

### *Defense Case*

Defendant testified at trial and denied the allegations of abuse. According to the defense theory, J.R. fabricated the abuse because she was angry at defendant for leaving her mother to care for his children while he moved to Rocklin with another woman in October 2006. The jury found defendant guilty on all counts.

### DISCUSSION

Defendant contends his trial counsel rendered constitutionally deficient assistance by failing to properly admit into evidence eight out-of-court statements made by J.R. that were purportedly inconsistent with her testimony at trial. Finding no prejudice, we need not decide whether counsel's performance fell below an objective standard of reasonableness.

### A.

### *The Out-of-court Statements*

*1.* During defense counsel's cross-examination of J.R., counsel asked which of her siblings lived at the Rancho Cordova apartment. After she testified M.W. and Z.W. lived there from the start, and G.W. was born after the move to the Rancho Cordova apartment, counsel asked whether A.M. also lived at the apartment. J.R. answered: "I don't remember how custody was then. I don't recall." Counsel then announced he would be reading from the MDIC interview. The prosecutor objected and asked: "Does it refresh recollection? For what purpose is he reading it?" Defense counsel then withdrew the intended question and asked J.R. whether she remembered telling the MDIC interviewer that A.M. lived at the apartment. J.R. answered: "I don't recall." Counsel then read from the interview, in which J.R. stated: "[A.M.] was there, [M.W.],

6

[Z.W.]. And I don't remember if [G.W.] was already born yet." J.R. testified she did not remember making that statement.

**2.** Later in the cross-examination, defense counsel asked J.R. whether she remembered the MDIC interviewer asking her "what would happen to kids if they told a lie." J.R. answered: "No, I don't." Counsel again announced he would be reading from the interview. The prosecutor again objected: "It's improper impeachment. It's not refreshing her recollection. It's hearsay." The objection was overruled. Defense counsel then read a portion of the interview in which the interviewer asked: "[W]hat could happen to kids if they tell a lie?" J.R. answered: "Could [*sic*] get in trouble some way, couldn't you?" and elaborated: "Probably grounded, first of all," and "[t]hey wouldn't be trusted." J.R. testified she did not remember making that statement.

**3.** Defense counsel then asked J.R. whether she remembered telling the MDIC interviewer she had "no clue" as to the address of the Rancho Cordova apartment or what grade she was in when she lived in Rancho Cordova. J.R. answered: "No, I do not." Counsel then read a portion of the interview in which J.R. answered "no clue" to these questions.

**4.** Immediately thereafter, defense counsel asked: "Now, you testified this morning that you believe you were seven years old when something first happened to you; correct?" J.R. answered: "Yes." Counsel asked: "Could you have been older than that, like eight or nine?" J.R. answered: "No." Counsel then asked whether she remembered telling the police officer she spoke to that she might have been eight or nine. J.R. answered: "No, I do not." Counsel then read a portion of J.R.'s interview with police in which she said the abuse began when she was "[e]ight or nine, maybe seven." After a brief bench conference, counsel again asked the question and J.R. answered that she did not remember making the statement.

**5.** Defense counsel then asked J.R. whether she remembered telling the officer her mother was either at work or in the shower when the incidents of abuse occurred.

J.R. answered: "No, I do not." Counsel then read a portion of the police interview, in which J.R. stated: "[S]he was working. And he'd even do it to me when she was in the shower, but she never knew. He'd always stop before she'd get home or she'd get out or something." Counsel asked J.R. whether she remembered saying the same thing to the MDIC interviewer. She answered: "No." Counsel then read a portion of the MDIC interview, in which J.R. stated: "But he'd always make sure that my mom wasn't home or she was, like, in the shower or something when we lived in Rancho, uh-huh."

6. Later in the cross-examination, defense counsel asked J.R. whether she told either the officer or the MDIC interviewer that defendant had threatened to burn her. J.R. said she did not remember. Counsel then asked whether it was true that, prior to her testimony at trial, she never told anyone defendant had threatened to burn her. J.R. answered: "No."

7. Defense counsel also asked J.R.: "You told the officer that [defendant] never changed what he did. He always did the same thing. Do you remember telling him that?" J.R. answered: "No." Counsel then read a portion of the police interview, in which she stated: "And then it kept going on. He never changed what he did, he always did the same thing. He never tried to make me touch anything and he -- he'd never go inside of me." A short time later, counsel asked J.R. whether she remembered telling the officer the same thing happened in Folsom that happened in Rancho Cordova. J.R. answered: "No, I do not." At this point, the prosecutor stated: "I'll stipulate that's what she told the officer." Defense counsel responded: "What was his objection?" The prosecutor replied: "No objection. I'm willing to stipulate she told [the officer] that the same thing happened in Folsom that happened in Rancho." Defense counsel responded: "I prefer to read it from the transcript if [the prosecutor] doesn't have a problem with that." The trial court then commented: "Well, the problem is it's not proper impeachment." Defense counsel then said: "I must be missing something."

8

*8.*     Finally, defense counsel asked J.R. whether she told the officer defendant did not stay in touch with her mother even though he had three children with her. J.R. answered: "I do not recall." Counsel then read a portion of the police interview, in which J.R. stated: "And after that he -- his roommate was pregnant, and so he ran off with her because she threatened to have him pay money if he didn't stay with her, take care of the baby and all that goodness." After J.R. testified she did not remember saying that to the officer, defense counsel read more of the interview: "And he just really didn't stay in touch with my mom at all when he had three kids with her." Counsel asked J.R. whether she remembered saying that to the officer. J.R. answered: "No, I do not."

**B.**

*Analysis*

Defendant asserts that, rather than read portions of the respective interviews to J.R. and ask whether she made the statements attributed to her, his trial counsel should have had J.R. review the statements to seek to refresh her memory. Defendant argues: "Had she reviewed those actual pretrial statements, there is a substantial likelihood she would have admitted making those contradictory statements, which could have gone a long way towards undermining her general credibility. Had she, conversely, denied having made those statements, counsel then could have called [the officer] and/or [the MDIC interviewer] as rebuttal witnesses to testify to [J.R.'s] prior inconsistent statements."

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) "'In order to

9

demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.""" (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) In determining whether counsel's performance was deficient, we must exercise "deferential scrutiny" (*People v. Ledesma*, *supra*, 43 Cal.3d at p. 216) and refrain from engaging in "the perilous process of second-guessing" counsel's rational tactical decisions. (*People v. Miller* (1972) 7 Cal.3d 562, 573.) Where, as here, the record does not contain an explanation for the challenged aspect of representation, the judgment must be affirmed on appeal unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground as stated in *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372.) Thus, we may reverse "'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission.' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

As a preliminary matter, we note that defense counsel certainly could have allowed J.R. to read the transcripts of her prior interviews to seek to refresh her memory. (See *People v. Wojahn* (1959) 169 Cal.App.2d 135, 141-142; 3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial, § 191, pp. 289-290.) But it is speculation to assert J.R. likely would have admitted making the statements had she reviewed them at the

10

witness stand rather than listen to counsel's recitation of them. With respect to each statement, J.R. testified she did not remember making the statement. There is no reason to believe this answer would have changed had she reviewed the statements herself. For the same reason, contrary to defendant's argument on appeal, there is no reason to believe counsel would have been able to lay a proper foundation for admitting these statements under Evidence Code section 1237, which requires that the witness "testif[y] that the statement he [or she] made was a true statement." (Evid. Code, § 1237, subd. (a)(3).)[1]

It appears as though counsel's main objective in his cross-examination of J.R. was not to refresh her memory, but to lay a foundation for the admission of these statements under section 1235 as prior inconsistent statements. "A witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement." (*People v. Ledesma* (2006) 39 Cal.4th 641, 710; §§ 770, 1235.) Here, defense counsel read the purportedly inconsistent statements to J.R. and gave her an opportunity to explain or deny them. (See *People v. Strickland* (1974) 11 Cal.3d 946, 954 [witness properly given an opportunity to explain or deny prior statements where the prosecutor made reference to the witness's prior statements and the witness denied making the statements].)

However, having laid a foundation for the admission of the statements in question, counsel did not attempt to call rebuttal witnesses to testify concerning these statements. One possible explanation for this omission is that counsel concluded J.R.'s "I don't remember" testimony was not sufficiently inconsistent with her prior statements to qualify for admission under section 1235. "'Normally, the testimony of a witness that he or she does not remember an event is not inconsistent with that witness's prior statement describing the event. [Citation.] However, . . . [w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied. [Citation.] As long as

---

[1]     Undesignated statutory references are to the Evidence Code.

there is a reasonable basis in the record for concluding that the witness's "I don't remember" statements are evasive and untruthful, admission of his or her prior statements is proper. [Citation.]'" (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 711, quoting *People v. Johnson* (1992) 3 Cal.4th 1183, 1219.) We need not decide whether there is a reasonable basis in the record for such a finding because, assuming defense counsel could have admitted J.R.'s prior statements into evidence, and further assuming his failure to do so fell below an objective standard of reasonableness, we conclude there is no conceivable prejudice.

J.R. candidly admitted during direct examination that she was not forthcoming with her father, the police, or the MDIC interviewer concerning the extent of defendant's abuse. She gave plausible reasons for minimizing the abuse, i.e., embarrassment, uncertainty as to what her father would think of her if he knew the extent of the abuse, and fear that she would get into trouble if she told the police and MDIC interviewer something different than she told her father. The jury believed her testimony. We conclude there is no reasonable probability the jury would have disbelieved her had they known about the minor inconsistencies contained in the statements at issue in this appeal. For instance, it is largely immaterial whether A.M. lived at the Rancho Cordova apartment or simply visited the apartment. Indeed, J.R.'s trial testimony that she did not remember A.M.'s custody arrangement at that time is arguably consistent with her prior statement that "[A.M.] was there" because she could have been there visiting. Even less material is the fact J.R. told the MDIC interviewer children can get into trouble if they tell a lie, and she had "no clue" as to the address of the Rancho Cordova apartment or what grade she was in when her mother lived in Rancho Cordova.

Defendant makes much of the fact J.R. testified that she was seven years old when he first started to rub his penis on her vaginal area, while she told the police she was "[e]ight or nine, maybe seven." This statement is not inconsistent because it includes the possibility she was seven. Moreover, J.R.'s testimony that she was seven is corroborated

12

by defendant's testimony that they moved to Rancho Cordova in "[e]arly to mid 2003" and J.R.'s testimony the abuse started before the birth of G.W., which happened in June 2003. J.R. turned eight in September 2003. More importantly, for purposes of whether defendant committed a forcible lewd or lascivious act on a minor under the age of 14, it is immaterial whether J.R. was seven or eight.

Defendant also argues: "[J.R.] testified that [he] molested her during the evenings, while her mother was at work. This created a believable scenario in which the molestations occurred during her mother's absence. [J.R.], however, apparently told the police officer and the MDIC interviewer that [defendant] sometimes molested her while her mother was in the shower. This information, unfortunately, could not have been considered by the jury. Had the jury received evidence that [J.R.] reported the molestations occurred while her mother was home -- certainly a less plausible scenario -- the jury reasonably might have doubted the veracity of [J.R.'s] allegations." The flaw in this reasoning is that it omits the fact J.R. testified that the second incident of abuse at the Rancho Cordova apartment happened while her mother was in her bedroom. Thus, the jury heard J.R. testify that her mother was home during at least one of the incidents and did not find this to be implausible.

Nor are we persuaded the remaining inconsistencies would reasonably have led to a different outcome. While J.R. did not tell police or the MDIC interviewer defendant threatened to burn her, and further stated in her police interview defendant "always did the same thing" and "never [went] inside of [her]," she admitted she did not tell the whole truth during these interviews. Finally, J.R. testified she neither saw nor spoke to defendant after he moved out of the Citrus Heights apartment. And in response to defense counsel's question, "Isn't it true in 2006 [defendant] took off with the gal he got pregnant, that was the last you saw of him," J.R. answered: "I don't know the exact year." Based on these responses, and defendant's testimony, defense counsel was able to argue in his closing argument that J.R. fabricated the abuse because she was angry at

13

defendant for leaving her mother to care for his children while he moved to Rocklin with another woman. In finding defendant guilty on all counts, the jury did not believe defendant's testimony and credited J.R.'s testimony.

Based on this record, we conclude there is no reasonable probability the result of the proceeding would have been different had J.R.'s out-of-court statements been admitted into evidence.

## DISPOSITION

The judgment is affirmed.

                                               HOCH          , J.

We concur:

       RAYE         , P. J.

       MURRAY       , J.