[Crim. No. 97. Fourth Appellate District.—April 21, 1934.]

THE PEOPLE, Respondent, v. A. L. CLINE, Appellant.

Ralph E. Swing and Vincent A. Marco for Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant was charged in one count of an information with the crime of grand theft in that he wilfully, unlawfully and feloniously took the sum of $240 from one Martin Frame and, in a second count, with the violation of section 222 of the Penal Code in that he wilfully, unlawfully and feloniously administered to the said Martin Frame a narcotic, anaesthetic and intoxicating agent, to wit: Phenobarbital, also known as luminal, with the intent thereby to enable and assist him in committing the crime of grand theft. He was further charged with a prior conviction of a felony and having served a term in the penitentiary as punishment therefor. The defendant admitted the prior conviction and pleaded not guilty to both counts of the information. A jury found him guilty on both counts and he has appealed from the judgment and from an order denying a new trial.

The appellant struck up an acquaintance with Martin Frame, a man sixty-one years old, in Pershing Square, in Los Angeles, on Saturday, October 14, 1933, and in the conversation that followed told Frame that he had been a banker in Denver and had come to California for his son's health. He expressed a desire to take Frame to his home to meet his son and also suggested he would like to take him to his ranch at El Centro. In the same conversation Frame told the appellant that he had $2,500 in postoffice savings and also $205 in a building and loan society. They agreed to meet at the same place on the following Monday, but the appellant did not then appear. However, on the next day, October 17th, they again met in Pershing Square. The appellant then gave Frame a suit of clothes which he said he had received through an estate of which he was administrator. The appellant spoke of going to El Centro, and that he wanted someone to go with him for company. Frame finally consented to go along, it being planned to go to El Centro that day, remain there overnight, and return the next day. The appellant had a Marmon sedan and the two set out for El Centro. The appellant first took Frame to his home in Glendale where he introduced

him to his son and where lunch was served. After lunch they again started out for El Centro, but stopped first at a washerwoman's house and later at a house in Altadena. The appellant told Frame that the purpose of this visit was to see an old lady over whom he was a sort of guardian, further telling him that some real estate man had beaten her out of her money, and that he and some other men were donating $10 apiece toward her upkeep. They then proceeded east on U. S. Highway 66 at a slow rate of speed, and during the ride the appellant asked Frame if he liked buttermilk, receiving an affirmative reply. The appellant stopped at a small roadside cafe, which it later developed was in Rialto, telling Frame to remain at the car while he went in to phone some man in San Bernardino, in order to save time when he got there. Frame testified that he thought the place they stopped was twenty to twenty-five miles from San Bernardino, but that he had never been there before and did not know the names of the towns along the way. The appellant went into the cafe and returned in a few minutes with a large glass of buttermilk, which he gave to Frame. Frame drank all of the buttermilk although he found it tasted a little bitter. The appellant took the empty glass into the cafe and they proceeded on their way. When he got in the car the appellant told Frame that he had not been able to get the man on the telephone, but had talked to the man's wife. Along about that time they again stopped and Frame ate a piece of pie and drank a cup of coffee. Soon after resuming their journey Frame dozed off to sleep and remembered nothing thereafter until he found himself in a room at the Antlers Hotel in San Bernardino. Nothing had been said about staying all night at San Bernardino.

The hotel clerk testified that the appellant came in about 7:30 o'clock that night and said he was driving through with an old gentleman, that they had stopped for a cup of coffee along the road, that the old gentleman had become ill, that he thought the man had heart trouble, and that he was afraid to go on. He registered for both men and secured two connecting rooms. He then went out and brought Frame in, and the clerk noticed that Frame was faltering and staggering, and that the appellant had to help him. Frame testified that when he found himself in

the hotel room he was almost all in, that he did not know what he was doing, and that he wanted to go to sleep. He remembered the appellant undressing him, telling him that his pulse was down to forty, saying something about a will, that he signed some slips or tablets three or four times, and that he signed two sheets of paper on the hotel stationery and a few other sheets of paper. He further testified that these sheets of paper had no typewriting on them at the time he signed them. The next thing Frame remembered, after being undressed, was when he awoke in the middle of the afternoon of the next day. He got his clothes on and went outside in search of a doctor. The hotel clerk testified that when he went out he staggered and could not seem to talk. All that he could understand was "doctor" and "house". He told him there was no house doctor, whereupon Frame staggered out the front door. Frame finally got to the office of a Dr. Love. This doctor testified that he at first thought Frame was drunk, but discovered he was not. Frame was able to tell him that the drinking of the buttermilk was the beginning of his illness. An examination showed a slow respiration, slow heart action, and feeble reflex action. The doctor concluded that Frame was under some strong hypnotic, which could have been luminal. Frame told the doctor that he could not find his money, and the doctor called the police station and an officer came and took him away.

The evidence shows that, in the meantime, the appellant took his car out of the garage early that morning, and, at about noon, appeared in Frame's room at Los Angeles and told the landlady that Frame was going to a hospital for treatment and had sent him for his clothes. With the assistance of the landlady he packed Frame's belongings in two suitcases, which he took away in his automobile. Late in the afternoon he again appeared at the Antlers Hotel in San Bernardino. The clerk told him "Your friend is looking for you." He replied, "He is not out is he" and "I told him to stay in his room." He asked where Frame had gone and then said, "Why, he will drop dead." He talked to another hotel employee who told him that he had seen Frame hanging on to a lamp-post in front of the hotel, acting as a drunkard would act, and that his legs and limbs gave way beneath his weight. This employee testified:

"I asked Mr. Cline what seemed to be the trouble, and I said, 'Mr. Frame was in a very bad condition when I saw him.' I said 'Mr. Holmes sent me out in front of the hotel and his tongue was very thick and he could hardly talk, and he kept sticking his tongue out and his limbs were giving away on him.' I says, 'What is the trouble with the man? He seems to be very ill.' And Mr. Cline said that he had stomach trouble and also heart trouble, and asked me then—seemed to be in a hurry to find this man and asked me if he came in if I would kindly keep him there, that he was a very sick man and that he should not be out in the street." The appellant then left, stating he was going to look for Frame. Shortly thereafter he appeared at the police station and asked if they had picked up an old man. He stated that the old man had been feeling badly for a few days, that he was taking care of him, that he had taken him to the Antlers Hotel, that during his absence the old man had wandered away, that he had not been feeling just right and was in more or less of a dazed condition, and that he did not know just where he might go or what might happen. The police officer told him that they had a telephone call from a doctor who said there was a man in his office who was under the influence of some narcotic or dope of some kind and that the old man claimed to have been robbed. The officer asked the appellant if he knew anything of this and the appellant replied that he had the man's money and also his keys. He asked where the doctor's office was and stated that he would go there. An officer was sent with him to the doctor's office and on the way the appellant twice asked the officer what he would have done under the same conditions. Before they arrived at the doctor's office another officer who had gone there took Frame to the hotel. Later, the appellant and the other officer came to the hotel, whereupon the appellant was arrested and taken to the police station. Frame was in a dazed condition and was taken to the county hospital where he did not awake until the next day.

The chief of police testified that he questioned the appellant as to why he had stopped in San Bernardino when he was on his way to El Centro and that he replied: "Well the old man was not feeling well and went to the hotel." The police chief testified: "I asked him how he came into

possession of the money and he said he took it from Mr. Frame. I asked if he took it with Mr. Frame's knowledge and consent and he said 'no'. I said, 'Well, why did you take it?' He said, 'I wanted to protect the old man.' He said he was sick and he had called a doctor, and I said, 'What doctor did you call?' and he was unable to tell me. It was at that time that I asked him if he had ever been in trouble before, or had been arrested, and he says, 'A little.' I says, 'Have you been arrested before?' And he says, 'Yes'. I told him that he might as well tell me because I would find out within an hour. 'Well', he says, 'I might as well tell you the truth, because you will find out anyway' and he said he was in trouble in Los Angeles. I says, 'What for?' and he says, 'For "bilking" an old woman.' . . . I asked him further if he had, when he took this $240 from Mr. Frame, if he had notified the hotel authorities that he had this money and he said that he did not. I asked him why he did not notify the proper authorities, that this man Frame was practically a stranger to him, and he says, 'Well I probably should have done so.' It was then that I ordered him booked on the grand larceny charge.'' The appellant was searched and there was found on his person Frame's keys, a small empty vial and the bag or sack in which the evidence shows Frame had had $240 in currency the night before, the sack having been pinned to his underclothes when he was undressed. A leather wallet was also found which contained about $273 in currency and the appellant stated that of this amount $240 belonged to Frame and the remainder to him. An officer was sent to search the appellant's car which he had left in a garage and found two suitcases full of clothes and other effects belonging to Frame. Frame identified his keys and the homemade sack, stating that he had this, with $240 in it, with him on the trip to San Bernardino, that it had disappeared and that he saw it next at the preliminary hearing. He also identified the two suitcases and their contents and testified that he had left them at his room in Los Angeles, and had not given the appellant permission to remove them. He also identified five Postal Savings Deposit certificates for $500 each as belonging to him and a deposit book in a certain bank showing a balance of $2,283.75, all of which he testified he did not have with him on the trip. These

papers, and other papers above referred to, signed by Frame, were found in a brief case in the appellant's automobile. An officer was later sent to search the automobile a second time and on this occasion he found in a recess behind the back upholstery of the rear seat a package wrapped in an old coat sleeve in which was a private detective's badge, three bottles containing luminal in various forms, and two bottles containing potassium cyanide. The city health officer, who was called to the police station to examine Frame, found him in a stupor, apparently under the influence of a sedative or drug, and ordered him sent to the county hospital. He testified that luminal acts as a sedative, that it produces sleepiness and slows down the mental activity and makes a person appear to be intoxicated, and that it was possible to determine whether luminal had been administered by an urinalysis. Another doctor testified that luminal was both a narcotic, an anaesthetic and an intoxicating agent, and that when taken it would appear in the urine for three or four days thereafter. Evidence was introduced that urinal specimens from Frame were taken while he was in the hospital and that they contained luminal. A typewriter which was found in the house occupied by the appellant in Glendale was introduced in evidence and expert evidence was introduced that the typewriting found on certain of the papers found in appellant's brief case were typed on this machine. So far as shown by the record, two of these papers read alike and thus appear: " 'October 18, 1933. In case of my demise I would like for the following persons to be notified and the following wishes to be carried out,' with the signature of Martin Frame at the bottom, . . . ''

A waitress in the cafe in Rialto testified that on October 17th the appellant came in between 5 and 6 P. M. and ordered a large glass of buttermilk, which she gave him, that when she started away he asked for a spoon, and that he took the buttermilk out to a car and returned in five or ten minutes with the empty glass. She testified that the appellant did not speak of using a telephone, that he did not use one, that it was not yet dark at the time, and that about five or six persons were then having dinner in the cafe. Another witness testified that he was eating in the cafe at that time; that he remembered no one else being

there except the waitress; that the appellant came in and asked for a glass of buttermilk; that when he received it he called the waitress back and asked for a spoon; that the witness then observed him with his hand above the glass and that he was stirring the contents of the glass; and that the appellant then went out, taking the buttermilk with him, and later came back with the glass.

The appellant first contends that the evidence is not sufficient to sustain a conviction upon either count. It is contended that the second count is, in fact, but a repetition of the first count and that the charge of theft was not sustained unless it can be said that the appellant was properly convicted of the charge of administering luminal to the prosecuting witness. It is further contended that all of the evidence was circumstantial, that the same is in all respects consistent with the hypothesis that the appellant is innocent, and that the evidence relied upon by the prosecution is so inherently improbable as to be unworthy of any belief.

It may first be observed that the charges set forth in the respective counts of the information are entirely distinct and separate and that a failure of proof as to the second count would not, of itself, constitute a failure of proof with respect to the first count.

In support of his contention that the evidence which must be relied upon for a conviction is inherently improbable, the appellant relies upon two inconsistencies therein. The first relates to the place where Frame drank the buttermilk. Frame testified that this was twenty to twenty-five miles from San Bernardino, while the two witnesses referred to testified that the appellant purchased buttermilk and took it out to a car at Rialto, which is about five miles from the center of San Bernardino. It is argued that the incident related by Frame must have taken place outside of the county of San Bernardino and could not have been the same incident testified to by the other two witnesses. Frame testified that he was unfamiliar with the country, that he never had been there before and did not know the names of the towns. In view of this and the fact that he went into a stupor shortly afterwards, it is not surprising that his estimate of the distance from San Bernardino proved to be incorrect. Another inconsistency appears

in the fact that Frame testified it was dark at the time he drank the buttermilk, while the waitress and the other occupant of the cafe testified to the effect that it was getting dark but was still light. It appears from all of the evidence that the incident occurred in the early evening. As was pointed out in *People* v. *Haydon*, 18 Cal. App. 543 [123 Pac. 1102], some inconsistency in the details of testimony is common and more or less natural. In view of the frailty of human memory and of differences in human observation, this not only is usually a matter that goes to the weight of the testimony but it frequently happens that such inconsistencies in fact indicate that witnesses varying as to details are more to be believed than those whose stories are too near identical. The alleged inconsistencies in the testimony here in question not only relate entirely to immaterial matters, but, in the light of circumstances, they are far from sufficient to make the testimony of these witnesses inherently improbable.

Without reviewing the evidence in detail, the condition of Frame at the time he was undressed by the appellant, the taking of the money from him without his consent, as admitted by the appellant, together with the evidence tending to show a felonious intent, is sufficient to sustain a conviction on the first count. The appellant, after taking the money from Frame's underclothing, removed it from its container and mingled it with his own, he obtained Frame's signature to a number of documents, he took Frame's keys and went to his room in Los Angeles where he took his clothing and personal effects, he took the postal certificates of deposit and other valuable papers and placed them in his own brief case, he told the landlady that Frame was going to a hospital and had sent for the clothes, he told the officers that Frame had been out of his head and unable to care for himself for several days and that he was taking care of him, and he gave an unsatisfactory explanation of his connection with the whole affair. It is argued that the fact that he went to the police station and the fact that he returned to San Bernardino indicate the purity of his motives. The theory is equally tenable that he intended to regain control of Frame and continue what he had apparently already begun, and that he admitted taking the money only when he saw that matters were in such a condition that he

could not proceed with his plans. There is ample evidence of criminal intent and it was entirely a question of fact for the jury, with the evidence sufficient to sustain its finding of guilt on the first count.

There is likewise evidence sufficient to sustain the conviction on the second count. This consists of the evidence that the appellant secured the buttermilk, asked for a spoon, was seen stirring the contents of the glass, that he gave the buttermilk to Frame, that Frame passed into a stupefied condition shortly thereafter, that luminal was found in his urine, that luminal was found secreted in the appellant's car, together with the medical evidence as to Frame's condition and the effects of luminal on the human system, and together with the actions and conduct of the appellant before and after the incident in question. In this connection, it is argued that the evidence is insufficient to show that luminal was administered to Frame, since it was not properly established that luminal was found in the samples of urine taken from him. While there was testimony to that effect it is argued that it is untrustworthy because the receptacle from which a sample was taken was left beside Frame's bed for probably an hour, during a part of which time the attendant was absent, and because when it was taken to the chemist for analysis the sample was poured into another bottle and there is no proof that the receptacles used were free from luminal. Not only does this objection go only to the weight of the evidence, but if this portion of the evidence were entirely omitted, the remaining evidence would justify the jury in finding that luminal was administered to Frame by the appellant.

It is next contended that the court erred in permitting the introduction into evidence of a typewriter found in the appellant's home in Glendale and of the testimony of an expert that the typewriting above referred to which was upon certain of the papers found in the appellant's brief case had been done upon that typewriter. The contention seems to be that under the rule laid down in *Wolf* v. *Gall,* 176 Cal. 787 [169 Pac. 1017], typewriting is not handwriting and that under that case and section 1870, subdivision 9, of the Code of Civil Procedure, the evidence referred to was inadmissible. In the case referred to, the court held that expert testimony was not admissible to show that one of

the defendants had prepared the deed on a particular kind of typewriter and further that it was immaterial whether or not that defendant did type the deed. That is far from being authority on the point here presented and as far as anything in this case is called to our attention, we are unable to see any reason why the evidence in question was inadmissible. Not only was it on a subordinate point, one of many going to show the intent of the appellant, but the surrounding circumstances made the evidence peculiarly admissible. Frame testified that he signed some papers at the request of the appellant in the hotel room when he was not in condition to know fully what he was doing. Some papers were found the next day in the appellant's brief case written on the stationery of this hotel in typewriting, with Frame's signature at the bottom. Frame had testified that no typewriting was on the papers when he signed them. The appellant was gone from San Bernardino during most of the next day and, without question, had gone back to Los Angeles. The papers were dated October 18th and were found in appellant's car after he returned. No effort was made to show that the typewriting was done by the appellant, but evidence was introduced to the effect that the typewriting was done on a typewriter found in appellant's home. In our opinion, this evidence was admissible and any question as to its weight was for the jury.

It is next urged that the court erred in refusing to grant a motion for a directed verdict on the ground that phenobarbital or luminal is not within the meaning of section 222 of the Penal Code. Two doctors had already testified that luminal was both a narcotic and anaesthetic and an intoxicating agent and, in view of this and other evidence, the motion was properly denied.

Appellant's next point is that the court erred in giving the following instruction:

"You are instructed that the term 'intoxicating agent' as used in the law and in this case includes any drug or substance or compound which when introduced into the human system so affects or disturbs the human system as to cause or produce a serious disturbance of the physical or mental equilibrium by causing or producing profound sleep, stupor, unconsciousness or semi-consciousness, together with impairment of the power of self control.

"And in this connection you are instructed that if you find from the evidence beyond a reasonable doubt that phenobarbital, also known as luminal, is an intoxicating agent, as hereinabove defined; and if you further find from the evidence beyond a reasonable doubt that at the time and place set forth in Count Two of the information, the defendant, A. L. Cline, did administer said phenobarbital, also known as luminal, to Martin Frame with intent thereby to enable or assist himself, the said A. L. Cline, to commit the crime of Grand Theft, a felony, then you must find the defendant guilty as set forth in Count Two of the Information."

It is argued that this instruction took from the jury the question of fact as to whether or not luminal is an intoxicating agent within the meaning of this section of the code. It is apparent that this instruction did not take this question from the jury but specifically presented it to them as a matter of fact. The court merely attempted to give a broad definition of certain things included in one of the terms of the section for the assistance of the jury, without excluding other possible elements. The intent of the section is shown by its explanatory title, "Administering Stupefying Drugs," and the section, after naming certain well-known drugs having a stupefying effect, proceeds to include any other narcotic, anaesthetic or intoxicating agent. While that portion of the instruction may seem to more properly apply to a narcotic than to an intoxicating agent, we are unable to see that it does not also fit the latter. At least two doctors testified as to the effects of luminal, their testimony showing that it comes within the description of effects contained in the instruction, and both testified that luminal was an intoxicating agent. The record does not disclose that the defendant at any time asked for an instruction purporting to define a narcotic and an anaesthetic, or any of the other drugs named in the section and, in the absence of any request for further definitions, we see no prejudicial error in the court failing to define the other words used in the section. There is ample evidence that luminal is an intoxicating agent, the question of fact was left to the jury, and if in any respect the first part of the instruction may be considered erroneous, the appellant has failed to point out any prejudice resulting therefrom and

a reading of the record fails to indicate a miscarriage of justice.

■ Error is next claimed in the sustaining of an objection to a hypothetical question asked of one of the doctors by the appellant. A reading of the question discloses that it ·was glaringly inconsistent with the evidence in the case upon which it was purportedly based, and the objection was properly sustained.

■ The appellant complains of the court's refusal to give an instruction asked for by him, to the effect that when a conviction is sought on circumstantial evidence alone it must not only be shown by a preponderance of the evidence that the facts are true but the proof must be absolutely incompatible with the innocence of the accused and incapable of explanation upon any reasonable supposition other than that of his guilt. The essentials of the requested instruction were given in another instruction, which reads as follows: "In order to sustain a conviction on circumstantial evidence, all of the circumstances proved must not only be consistent with each other, but consistent with the hypothesis that the accused is guilty, and at the same time inconsistent with the hypothesis that he is innocent, and with every other rational hypothesis except that of guilt."

■ Numerous objections are raised to statements made by the district attorney in his opening statement and in his argument to the jury, it being claimed that these constituted prejudicial misconduct. It is argued that these statements are not supported by the evidence and that the district attorney, in his closing argument, appealed to the passion and prejudice of the jurors. In most, if not all, of the instances cited the appellant made objection at the time that the district attorney was going outside of the record and, at the request of the appellant, in almost every instance the court instructed the jury either to disregard the remark of the district attorney or to disregard the same unless they remembered that it was in accordance with the evidence. It would serve no useful purpose to set forth the many statements complained of but, after carefully examining the same, we are of the opinion that most of them were in accord with the evidence or constituted such an inference as the district attorney had the right to con-

tend for. We find nothing in any of the statements even remotely resembling reversible error.

We find no prejudicial error in the record and, after reading the entire transcript, we are not convinced that any miscarriage of justice has occurred.

The judgment and order appealed from are affirmed.

Marks, J., and Jennings, J., concurred.