[No. H019572. Sixth Dist. May 10, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
LUIS LEDESMA AVILA, Defendant and Appellant.

**COUNSEL**

R. Charles Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Ronald E. Niver and Clifford K. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PREMO, Acting P. J.**—Defendant Luis Ledesma Avila was found guilty at a court trial of six counts of sodomy against two victims and received 14 years in state prison. On appeal, he challenges the constitutionality of Penal Code section 286, subdivision (i),[1] sodomy by use of drugs, and the sufficiency of the evidence to support conviction.

FACTS

On separate occasions on February 1, 1998, and April 10, 1998, appellant, who was known as a "curandero," that is, "a person who heals, who cures

[1]Further statutory references are to the Penal Code unless otherwise noted.

witch diseases," was asked to "cleanse" two 14-year-old boys. The mother of John Doe I thought evil spirits had entered him because he had been playing with a Ouija board.[2] John Doe II was "ill from his chest."[3]

In each case, appellant said the boy would have to stay overnight. After the parents left, appellant gave each boy a pill which made them dizzy. He gave John Doe I a drink with a blue pill (identified at trial as Benadryl) and later an orange pill (identified as Ambien). Appellant gave John Doe II a drink with a white or pinkish pill in it (which looked like Ambien) and a cup of water with a white powder in it. When each boy awoke sometime later, appellant was putting his penis in the boy's anus. Each boy tried to get away but was held down by appellant.

Neither boy told his parent what happened immediately upon being picked up. John Doe I said he was afraid of appellant because appellant knew how to do "witchcraft." John Doe II explained that he was afraid appellant "might do something" to his parents because appellant was a "curandero" with powers to do good or evil. However, both boys later revealed that appellant had sodomized them. Their families reported the incidents to the police.

A medical examination of John Doe I six weeks after the assault did not reveal abnormal findings. John Doe II was examined the same day he was assaulted, as was appellant who accompanied John Doe II and his parents to a doctor's office after being confronted about their son's complaint.

Swabs of the mouths of appellant and John Doe II contained an uncommon bacteria, capnocytophaga, normally contained within the mouth and transmitted by mouth-to-mouth contact. The microbiologist stated that in her 18 years of experience, she had never observed this organism. Three days later, on April 14, 1998, a pediatrician examined John Doe II and observed redness (erythema) and venous pooling in the rectum which was consistent with friction caused by a penetrating object.

Pursuant to a search warrant, prescription and nonprescription drugs and two videotapes depicting acts of sodomy and oral copulation between adult males were seized from appellant's bedroom. Appellant was interviewed and admitted giving John Doe II a blue pill "[j]ust to relax the body."

Thomas Pelikan, a registered pharmacist with a Ph.D. in pharmacology, who was a clinical pharmacist for 20 years, 10 of them at Natividad Medical Center, identified the drugs seized from appellant's room. The blue pills in

[2]Superior court case No. SS980865.
[3]Superior court case No. SS980719.

Exhibit 4 were diphenhydramine, a generic form of Benadryl. It is an antihistamine "which has strong sedative properties." Pelikan defined "sedative" to mean "if you take a dose it will make you drowsy. If you take a larger dose, it will put you to sleep."[4] Pelikan said children were generally more sensitive to the drug than adults.

Exhibit 6 was a prescription bottle containing Ambien, the "orange" pills identified by John Doe I or the "white or pinkish" pills identified by John Doe II. Pelikan stated that Ambien is "a sedative. . . . a prescription form of a drug closely related to Valium . . . . The effects would be sedative hypnotic effects, which means a low dose will produce sedation; [a] higher dose will produce sleep." Ambien would be the strongest drug; diphenhydramine or Benadryl would be next strongest.

Appellant was charged in each case with one count each of forcible sodomy (§ 286, subd. (c); count 1), sodomy of an unconscious person (§ 286, subd. (f); count 2), and sodomy by use of drugs (§ 286, subd. (i); count 3). In the second case, the district attorney alleged that the crimes were committed while appellant was released on bail pending proceedings on the offenses alleged in the first case. (§ 12022.1.) The cases were consolidated and appellant was found guilty of all counts in a court trial. The court also found true the on-bail allegation. The 14-year sentence was imposed. This appeal ensued.

## ISSUES ON APPEAL

Appellant asserts first, that section 286, subdivision (i) (hereafter, subdivision (i)), is unconstitutionally vague as applied here; and second, that the evidence is insufficient to support the convictions under that subdivision. This claim is based on appellant's belief that the drugs administered to the victims were all antihistamines[5] and that antihistamines "do not fall within dictionary definitions of the term 'anesthetic.' "

## CONSTITUTIONALITY

■ Appellant claims that subdivision (i) is unconstitutionally vague because its prohibitions are not "clearly defined" so as to provide adequate warning of what was prohibited. Specifically, subdivision (i) "fails to define

---

[4]Exhibit 5, found in appellant's room but not identified by either of the victims, was doxylamine, "another antihistamine which has strong sedative properties which has been used actually for a sleep aid." Exhibit 8, also not identified by either victim, was the antihistamine Chlor-Trimeton. It "has sedative properties also, although not as strong as the other ones."

[5]Appellant apparently forgets that each boy was given Ambien, a prescription form of Valium, as well as the "blue pill," a generic form of Benedryl.

the term 'anesthetic' with sufficient certainty. As interpreted and applied by the trial court the statute becomes unconstitutionally overbroad because it includes not only anesthetics, but a number of non-anesthetic substances such as cold and allergy medications that are readily available in any drug store or supermarket." Since subdivision (i) does not explicitly include inducing drowsiness by use of antihistamines, the trial court erred in resorting to a dictionary for interpretation of the statute.

Appellant concedes that the dictionary definition used by the trial court did bring antihistamines within the meaning of anesthetics, but "[a]t best, the trial court's resort to a misinterpretation of the dictionary definition of anesthetics merely converted a facially vague statute into a statute that was interpreted in an unconstitutionally overly broad manner."

Subdivision (i) provides: "Any person who commits an act of sodomy, where the victim is prevented from resisting by an intoxicating or anesthetic substance, or any controlled substance, and this condition was known, or reasonably should have been known by the accused, shall be punished by imprisonment in the state prison for three, six, or eight years."

■ " 'Penal Code sections must generally be construed " 'according to the fair import of their terms, with a view to effect its objects and to promote justice.' " ' [Citations.] [¶] 'Consistent with that general principle, appellate courts first examine the language of the code section to determine whether the words used unequivocally express the Legislature's intent. If no ambiguity, uncertainty, or doubt about the meaning of the statute appear, the provision is to be applied according to its terms without further judicial construction. [Citations.] [¶] When the language of the section is on its face ambiguous or leaves doubt, . . . , the court must resort to extrinsic aids to ascertain the purpose behind the statute and give the provision a judicially created meaning commensurate with that purpose. [Citation.]' [Citations.] ■ ' "To evaluate [a] claim of vagueness, this court will 'look first to the language of the statute, then to its legislative history, and finally to California decisions construing the statutory language. [Citations.]' " ' [Citation.]" (*People v. Cortez* (1994) 30 Cal.App.4th 143, 157 [35 Cal.Rptr.2d 500].)

"Words used in a statute . . . should be given the meaning they bear in ordinary use." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) A statute provides adequate notice when its "language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." (*Jordan v. De George* (1951) 341 U.S. 223, 231-232 [71 S.Ct. 703, 708, 95 L.Ed. 886].)

■ At trial, the court concluded that no controlled substances or intoxicants had been used, but resorted to the extrinsic aid of Webster's New

World College Dictionary for the definition of "anesthesia" to decide that "the substances used here contributed to a loss of consciousness or sleep . . . ."[6] Appellant asserts that this conclusion is "unsupported by either legal or medical authorities."

The first appearance of the concept "prevented from resisting by an intoxicating or anesthetic substance, or any narcotic" occurred in the Penal Code in 1872 in connection with the crimes of rape where a person is prevented from resisting by any intoxicating or anesthetic substance, or narcotic (former § 261, subd. (3)), now, with "narcotic" changed to "any controlled substance" (§ 261, subd. (a)(3)) and administering stupefying drugs to assist in the commission of a felony (§ 222). Section 222 forbade the "administering to another any chloroform, ether, laudanum, or any other narcotic [now, 'any controlled substance' (Stats. 1984, ch. 1635, § 78, p. 5864)], anesthetic, or intoxicating agent, with intent thereby to enable or assist himself or herself or any other person to commit a felony, . . ."

Over a century later, in 1979, the "prevented from resisting" language was added to section 262, subdivision (a)(2), rape of a spouse. (Stats. 1979, ch. 994, § 2, p. 3384.) In 1986, the language was placed in statutes making criminal other sexual acts performed on persons who had not given legal consent: sodomy (§ 286, subd. (i); Stats. 1986, ch. 1299, § 3, p. 4594), oral copulation (§ 288a, subd. (i); Stats. 1986, ch. 1299, § 5, p. 4597), and penetration with a foreign object (§ 289, subd. (e); Stats. 1986, ch. 1299, § 6, pp. 4598-4599).

From the enactment of the rape statute in 1872, the Legislature recognized that "[t]he essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. . . ." (§ 263; *People v. Stanworth* (1974) 11 Cal.3d 588, 605 [114 Cal.Rptr. 250, 522 P.2d 1058].) Thus, "[a]ny sexual penetration, however slight, is sufficient to complete the crime." (§ 263.) This language also applies to sodomy (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1176 [270 Cal.Rptr. 286, 791 P.2d 965]) and, we suspect, if the subject were to come up, to the other sexual assaults listed above. Sexual

---

[6]The court stated: "[A]re those substances [the 'blue pill' and Ambien] controlled? There was no evidence that they are. Are they intoxicants? There was not evidence that they were intoxicants. Are they anesthetic substances, which before I read the Websters [*sic*] definition, I assumed that anesthetic meant sleep inducing? It doesn't mean exactly that, according to Websters [*sic*] New World College Dictionary. Anesthetic is defined as relating to, characterized by anesthesia, and anesthesia is defined as a partial or total loss of sense of pain[,] temperature, touch, etcetera [*sic*], produced by disease or, two, loss of sensation induced by—and there's hypnosis, acupuncture, and limited to a special area, local anesthesia, or involving a loss of consciousness, general anesthesia. It appears to me that the substances used here contributed to a loss of consciousness or sleep and, therefore, the elements of 286(i) are met."

penetration, however slight, without consent, outrages the person and feelings of the victim.

Outrage, however, is not a consideration where a sexual act is consensual. ■ " '[C]onsent' shall be defined to mean positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) Thus, consent obtained by force or fear, or by fraud, or when a person is prevented from resisting by an intoxicating or anesthetic substance or any controlled substance, or by any other means described and proscribed in the statutes, is not legal consent.

■ Thus, we conclude that the purpose of the language in subdivision (i) is to define the crime in terms that clearly warn against the commission of sodomy on a victim whose ability to resist, i.e., to refuse consent, is prevented by substances having anesthetic or intoxicating effects, or the effects caused by controlled substances.

Appellant asserts that antihistamines are not drugs of the type listed in the statute. To be constitutional, he claims, the law must define "what constitutes an intoxicating substance" or an anesthetic. "Antihistamines," he says, after providing us with medical dictionary definitions of "anesthesia" and "intoxicant" and general dictionary definitions of "histamine" and "antihistamine," "suppress the release of histamine [an 'amine compound—$C_5H_9N_3$'—] in the body. Unlike anesthetics, they do not desensitize nerves or cause any loss of the sense of pain, temperature, touch, or other bodily feelings. Nor do they intoxicate. [¶] . . . The testimony showing that antihistamines were used in this case does not bring the offense within subdivision (i)."

We disagree. Given the purpose of the statute, the Legislature did not intend these terms to be used with pharmacological exactitude but in accordance with the meanings the words "bear in ordinary use."[7] (*Lungren v. Deukmejian, supra,* 45 Cal.3d 727, 735.)

The Random House Dictionary of the English Language (2d ed. 1987), defines "anesthesia" as: "1. *Med.,* general or local insensibility, as to pain and other sensation, induced by certain interventions or drugs to permit the performance of surgery or other painful procedures. 2. *Pathol.* general loss

---

[7]"Controlled substance" is a term of art used in division 10, Health and Safety Code section 11000 et seq., the Uniform Controlled Substances Act. It was added by Statutes 1972, chapter 1407, section 3, page 2987; the former division 10, "Narcotics," was repealed at the same time by Statutes 1972, chapter 1407, section 2, page 2987. The drugs constituting controlled substances are listed in Health and Safety Code sections 11054 to 11058 inclusive.

of the senses of feeling, as pain, heat, cold, touch, and other less common varieties of sensation. . . ." (*Id.* at p. 78.)

Pelikan stated that both the blue pills and Ambien are drugs that make the recipient drowsy or sedated in small doses and put him or her to sleep in larger doses. Ambien has sedative hypnotic effects on its recipients. Both boys and Pelikan said the pills either put them to sleep or were of a type which induced sleep. .

"Sleep" means "to take the rest afforded by a suspension of voluntary bodily functions and the natural suspension, complete or partial, of consciousness; to cease being awake." (The Random House Dictionary of the English Language, *supra*, at p. 1797.) A substance that makes a person sleepy has a sedative effect. "Sedative" means "1. tending to calm or soothe. 2. allaying irritability or excitement; assuaging pain; lowering functional activity. . . ." (*Id.* at p. 1732.) Pelikan's word "hypnotic" in reference to Ambien also means "4. inducing sleep. . . . 5. an agent or drug that produces sleep; sedative." (*Id.* at p. 943.) Insofar as either the blue pills or Ambien put the boys into a state of drowsiness, that is, a state of reduced general or local sensibility, or calmed or soothed them, or induced sleep, the substances had an anesthetic effect.

### SUFFICIENCY OF THE EVIDENCE

We turn now to cases interpreting this statutory language to determine whether the testimony of John Does I and II and Pelikan, the expert witness, supplied sufficient evidence from which the court could conclude that the drugs given the boys prevented them from resisting appellant's sexual advances. These cases require detailed statements of fact.

The only published case on section 222 is *People v. Cline* (1934) 138 Cal.App. 184 [31 P.2d 1095]. There the defendant, bent on grand theft, administered phenobarbital, also known as Luminal, in a glass of buttermilk to the victim, Martin Frame, while they were traveling to El Centro from Los Angeles. Frame drank all the buttermilk, which he thought tasted bitter, dozed off, and remembered nothing until he found himself in a room at a hotel in San Bernardino. He remembered the defendant's saying something about a will and that he signed four to six slips and sheets of paper.

The clerk on duty when the defendant brought Frame in noticed Frame was faltering and staggering and that the defendant had to help him. When Frame awoke in the middle of the afternoon of the next day, the defendant

was out.[8] Frame went in search of help. The clerk on duty testified that Frame was staggering. Frame said something in which the clerk understood the words "house" and "doctor" but Frame could not seem to talk. Another employee saw Frame hanging on to a lamppost in front of the hotel, acting as a drunkard would act, and said that Frame's legs and limbs gave way beneath his weight.

The doctor at whose office Frame ended up, testified that at first he thought Frame was drunk, but discovered he was not. Frame was able to tell him that drinking the buttermilk was the beginning of his illness. An examination showed slow respiration, slow heart action, and feeble reflex action. The doctor concluded that Frame was under some strong hypnotic, which could have been Luminal and called the police. (*People v. Cline, supra,* 138 Cal.App. at pp. 186-189.)

The evidence which the court stated was sufficient to sustain conviction was: the appellant obtained a glass of buttermilk from a waitress and then called her back to supply a spoon; thereafter he was observed stirring the buttermilk in the glass which he gave to the victim who "passed into a stupefied condition shortly thereafter, that luminal was found in [the victim's] urine, that luminal was found secreted in the appellant's car [in which appellant had brought the victim to the hotel], together with the medical evidence as to [the victim's] condition and the effects of luminal on the human system, and together with the actions and conduct of the appellant before and after the incident in question." (*People v. Cline, supra,* 138 Cal.App. at p. 194.)

In cases involving "rape by drugs" (*People v. Wojahn* (1959) 169 Cal.App.2d 135, 141 [337 P.2d 192]), the courts also focussed on the effect of the drug on the recipient in determining whether the evidence was sufficient. In 1911, one glass of red wine served to prosecutrix by a waiter at a restaurant during a dinner with the defendant that lasted from 5:00 to 11:30 p.m., left the prosecutrix feeling weak and dizzy as she left the restaurant. She walked with the defendant to a hotel where the defendant booked a room. She did not speak to the landlord or ask for help. She fell asleep immediately when she went to bed. She testified she knew it was wrong to go with the defendant, but she did not speak to anyone because " 'I did not know what I was doing; I was under the drug.' " (*People v. Crosby* (1911) 17 Cal.App. 518, 523 [120 P. 441].)

The next day, her mother thought she was a nervous wreck, that she seemed dazed, and was sometimes incoherent. Her eyes were dull, and her

---

[8]The defendant was back in Los Angeles collecting Frame's belongings from his room and his money from his bank.

memory was not so good. Thirty-six hours after the event, a physician found her to be very nervous with a rapid and weak pulse. He believed she was under the effect of a narcotic. The reviewing court found this evidence sufficient to sustain the conviction; nevertheless, prosecutorial misconduct required a reversal.

In 1959 in *People v. Wojahn, supra,* 169 Cal.App.2d 135, the prosecutrix consulted the defendant, a physician, for chest pains and because she feared tuberculosis. The defendant administered a shot which he said was to cut the mucous in her throat and a capsule to quiet her nerves. He was familiar with the administration of anesthetics involving combinations of drugs. After receiving the drugs, prosecutrix "was unable in standing against a wall with her eyes closed to touch her nose with her fingers. She felt light and relaxed, her feet felt glued to the floor, and she felt as though her body were swaying." (*Id.* at p. 139.) Nevertheless, she remained capable of feeling the defendant having one or more acts of sexual intercourse with her. The defendant told her he "did that" to raise her blood pressure. (*Ibid.*)

A neighbor whose help prosecutrix sought observed her to be nervous, upset, red-eyed, her lipstick smeared, her hair mussed, and her legs shaking. The neighbor accompanied prosecutrix to the police station where the police captain observed her hair to be disheveled, her eyes red, and she was crying, hysterical, and appeared to be drugged. Later, she was examined by a doctor at the county hospital, although she was not tested for drugs. The doctor observed her to be nervous and excited, a condition consistent with the possibility of a sexual assault. The People's expert testified that her symptoms as related would indicate that she was under the influence of drugs. (*People v. Wojahn, supra,* 169 Cal.App.2d at p. 139.)

The *Wojahn* court stated, "Rape by drugs may be proved by circumstances and surroundings. [Citation.] . . . Here there was sufficient evidence on this subject." (*People v. Wojahn, supra,* 169 Cal.App.2d at p. 141.) "The fact that [the prosecutrix] was not given any tests for drugs on the day of the attack, while regrettable, is not fatal to the prosecution's case. Generally, from the very nature of the offense there can be no direct evidence of the administration of a drug. While the prosecution's case here may not be altogether satisfactory, it does support the theory of the prosecution and its weight was a matter for the jury and is sufficient to sustain the verdict. [Citation.]" (*Id.* at p. 141.)

In *People v. Ing* (1967) 65 Cal.2d 603 [55 Cal.Rptr. 902, 422 P.2d 590], a 17-year-old girl sought the defendant doctor's aid in obtaining an abortion. A series of four office visits was arranged and on each occasion, the defendant gave the girl a shot which made her feel dizzy after which he had

sexual intercourse with her. She "testified that when she received a shot she 'just didn't care about anything,' that she did not believe that she would have had intercourse with defendant had it not been for the shots . . . , and that she never had intercourse with defendant when she was not under the influence of drugs. She further stated that the reason she had continued to see [defendant] was to get the shots, that she became more interested in the shots than in the abortion." (*People v. Ing, supra,* 65 Cal.2d at p. 607.)

The owner of the rooming house where the girl was staying stated that she "appeared to be 'high' 70 or 80 percent of the time and did not act like a normal '19' year-old girl; that she would be either bleary-eyed and groggy or depressed and moody; that the pupils of her eyes were dilated; and that she wanted to sleep all the time, on occasions would fall asleep while talking, and sometimes slept 18 hours without waking. The witness, who as a student nurse worked with narcotic addicts, further testified that she thought the prosecutrix was on drugs." (*People v. Ing, supra,* 65 Cal.2d at p. 608.)

To summarize, the reactions the victims in these cases experienced were dizziness, sleepiness, relaxation, incoherence, memory loss, being "high," being "more interested in the shots than in the abortion" (*People v. Ing, supra,* 65 Cal.2d at p. 607), and lack of coordination (staggering, inability to speak clearly, inability to touch nose with fingers, feeling as if her feet were "glued to the floor" with body swaying). In some of the cases, the evidence identified the substance administered to the victim—phenobarbital to Frame, for example (*People v. Cline, supra,* 138 Cal.App. at p. 186)—and in others, the identity of the substance was not established—an unidentified injection and capsule in *People v. Wojahn, supra,* 169 Cal.App.2d at p. 139; a glass of red wine with extraordinary and long-lived effects in *People v. Crosby, supra,* 17 Cal.App. at p. 522; unidentified shots in *People v. Ing, supra,* 65 Cal.2d at pp. 607-608. Thus it appears that the drug's effect on the victim can be sufficient to establish whether the statute is violated even if the specific drug is not identified.

In our case, the boys stated that appellant gave them pills, they identified similar pills which had been seized from appellant's room, and they described the effects the pills had on them. Pelikan the pharmacist identified the pills given to the boys and testified to the effects these drugs have on the human body. This testimony is sufficient to establish the identity of the drug and the probable effect when used as testified by the victim. (*People v. Scott* (1914) 24 Cal.App. 440, 450 [141 P. 945].)

Subdivision (i) is not unconstitutionally vague, nor was it interpreted in an overbroad fashion. A statute provides adequate notice when its

"language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." (*Jordan v. De George, supra*, 341 U.S. at pp. 231-232 [71 S.Ct. at p. 708].) The action forbidden by subdivision (i) is the sodomizing of another person who is prevented from resisting by drugs having the effects described in the common meanings of the terms used in the statute.

The court did not err in finding appellant guilty of two violations of subdivision (i).

### DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, J., and Wunderlich, J., concurred.

A petition for a rehearing was denied May 24, 2000, and on June 7, 2000, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 16, 2000.